```
             IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ALABAMA
                      SOUTHERN DIVISION

RONDA BRYANT,                    }
                                 }
     Plaintiff,                  }
                                 }      CIVIL ACTION NO.
v.                               }      05-AR-1745-S
                                 }
JEFFERSON COUNTY HOUSING         }
AUTHORITY, et al.,               }
                                 }
     Defendants.                 }
```

**MEMORANDUM OPINION**

Before the court is the motion of defendants, Jefferson County Housing Authority (the "Housing Authority"), Lewis McDonald ("McDonald"), and David Wilkinson ("Wilkinson" and with McDonald, the "Individual Defendants"), for summary judgment against plaintiff, Ronda Bryant ("Bryant"). Bryant is suing the Housing Authority, her former employer, and the Individual Defendants, for retaliatory termination in violation of the False Claims Act (the "FCA"), 31 U.S.C. § 3730(h). Bryant also claims that her termination infringed her constitutional right of free speech in violation of 42 U.S.C. § 1983. Finally, included in Bryant's complaint were five other claims, which, she agrees, should be dismissed with prejudice. The court's jurisdiction is based on 28 U.S.C. § 1331. The Housing Authority and the Individual Defendants assert, as they must under Rule 56, Fed. R. Civ. P., that there is no genuine issue of material fact and that they are entitled to

1

judgment as a matter of law.  For the reasons that follow, the motion for summary judgment will be granted.

## I. Statement of Undisputed Facts[1]

The Housing Authority provides housing to moderate and low-income individuals and families in unincorporated sections of Jefferson County, Alabama.  A significant portion of the Housing Authority's funding comes from the United States Department of Housing and Urban Development ("HUD").  The Housing Authority has entered into a series of annual contribution contracts with HUD and is the administrator of HUD's Section 8 programs in Alabama, Mississippi, and Connecticut.

Bryant began working for the Housing Authority in 1994.  In 2004, she became a Section 8 occupancy specialist.  She continued as an occupancy specialist until her termination in February, 2005.  During her employment, Bryant reported to Judy Bryant, the Section 8 program coordinator.  Both women reported to Lewis McDonald, the executive director of the Housing Authority.  As an occupancy specialist, Bryant's duties included administrative tasks and

---

[1] Summary judgment is appropriate where the moving party demonstrates that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Rule 56(c), Fed.R.Civ.P.; *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).  In assessing whether the movant has met its burden, the court must view the evidence, and all inferences drawn therefrom, in the light most favorable to the non-movant.  *Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 918 (11th Cir. 1993).  In accordance with this standard, the following statement of facts includes both undisputed facts and the facts according to the plaintiff's evidence, where there is a dispute.

supervising properties that were participating in the Section 8 program. The Section 8 program provides government-sponsored housing vouchers to qualifying, low-income residents who then deliver the vouchers to private landlords in lieu of normal rent. Under the program, a private owner may apply to the Housing Authority for a rental subsidy when a qualifying tenant moves into the property. In order to be and remain eligible, the property must meet the guidelines set forth in the HUD regulations. It is the responsibility of the Housing Authority to conduct property inspections and determine if the property meets the occupancy standards established by HUD regulations.

   *a) Rent Concessions:*

   A few months before she was terminated, Bryant was placed in charge of the Housing Authority's relationship with the Westchester Apartments property, an apartment building owned by SPM, Inc. SPM, a private corporation, had purchased the building from the Housing Authority some time before Bryant began working as an occupancy specialist. Bryant claimed in her complaint that she received a phone call from an angry Westchester tenant who complained that SPM had increased the rent on his apartment. The new rent was markedly higher than when the Housing Authority owned and managed the building. According to Bryant, the angry caller and tenants like him had been given a rent abatement by the Housing Authority because Westchester had a leaky roof. In her complaint, Bryant

states that she learned from an unnamed source that, during its ownership of the Westchester, the Housing Authority was improperly allowing substandard rental units to pass inspection in order to collect the full rental subsidy provided by HUD. All this changed, however, when SPM purchased the building from the Housing Authority. According to Bryant, SPM was making the necessary repairs to the building and was charging rent at the market rate.

It is clear from the record that Bryant personally believed the rent concessions to be violative of HUD regulations and illegal. Bryant informed Judy Bryant, her immediate supervisor, of her findings. Judy Bryant, in turn, made a report to McDonald, who confirmed to her that rent concessions had been made but said that such arrangements were legal. The precise details of Bryant's investigation into the rent concessions remain unclear. According to Bryant, she talked with a tenant (whose identity is unknown) and conducted "independent research" on the legality of the concessions. She also testified that she spoke with some of her co-workers about the matter. There is no evidence to suggest that the Housing Authority or McDonald had any knowledge of Bryant's investigation. It is also undisputed that Bryant made no attempt to contact HUD, nor did she file a formal complaint of any type. In her affidavit, Bryant does state that, after her termination, she helped prepare and send a letter "to the Federal Government" regarding the rent concessions. There is no evidence that the

4

letter was received by a relevant authority. The Federal Government is, of course, a multifarious institution, and one can only speculate where her missive eventually came to rest. Also, the ultimate legality of the rent concessions has nowhere been adjudicated and it remains unclear, which, if any, regulations were violated.

    *b) Fire Damage*:

In an unrelated incident, Bryant received a phone call from a Section 8 landlord[2] whose rental house had been damaged by a fire. This landlord called the Housing Authority to ask if he was entitled to compensation for the amount of rent he lost after the fire and before repairs on his property were completed. According to Bryant's deposition testimony, she informed the landlord that he was not entitled to back rent or other payments under the HUD regulations. Shortly thereafter, Bryant was approached by McDonald, who asked her if there was any way that the Housing Authority could assist the landlord. In response, Bryant told McDonald not only that paying the landlord would be illegal, but that if he tried to do so, she would report him to HUD. There is no indication that the landlord was ever paid, nor is there any

---

[2] There is some confusion, in both the pleadings and depositions, as to the proper characterization of this caller. In both Bryant's pleadings and testimony, he is identified as a "landlord." Defendants consistently refers to him as a "tenant." For purposes of this opinion, the caller's status is inconsequential.

5

evidence that such a payment would in fact be illegal. As with the rent concession issue, the only action taken by Bryant was to include the incident in the letter addressed to "the Federal Government."

## II. Analysis

*a) The FCA*

The FCA prohibits false or fraudulent claims made to the federal government and establishes civil liability when such claims are made. Under the FCA, civil actions may be brought by the government or by a private, *qui tam* plaintiff on behalf of the government. 31 U.S.C. § 3730(a)-(b). In addition, the FCA contains a "whistle-blower" protection provision which prohibits retaliatory employment action against employees who bring false claims to light. 31 U.S.C. § 3730(h). This provision provides:

> Any employee who is discharged, demoted, suspended, threatened, harassed, or in any manner discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole.

To assert a retaliation claim, Bryant must show: (1) that she engaged in protected activity; (2) that the Housing Authority and McDonald knew she was engaged in a protected activity; and (3) that she was discharged because of it. *See* S.Rep. No. 345, 99th Cong., 2d Sess. 34-35 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5299-

6

300. Bryant argues that her conduct with respect to the rent concessions and the fire damage was protected by the statute. She also argues that she made the Housing Authority and McDonald aware of her conduct and that her termination was an act of retaliation.

### i. Protected Conduct

Determining whether an employee has engaged in a protected conduct is a fact-specific inquiry. *Shekoyan v. Sibley Intern.*, 409 F.3d 414, 423 (D.C. Cir. 2005). The plain language of § 3730(h) indicates that, to be protected, plaintiff's conduct "must be, at least, incident to an actual "lawsuit" filed or to be filed under the FCA." *Mann v. Olsten Certified Healthcare Corp.*, 49 F. Supp. 2d 1307, 1313 (M.D. Ala. 1999). However, as the *Mann* court noted, this narrow interpretation of the statutory language has been rejected. "Instead, [courts] have broadly interpreted the statute to provide protection in cases in which the plaintiff did not even know of the FCA or that her conduct was protected, so long as FCA litigation was a distinct possibility when the plaintiff acted." Id. It is, though, no easy task to determine what, precisely, is meant by a "distinct possibility."

In reaching a workable definition of "distinct possibility," it is helpful to set forth the limitations that courts have imposed on the universe of protected conduct. *Mann*, 49 F. Supp. 2d at 1313. First, as the D.C. Circuit stated, "an employee's investigation of nothing more than his employer's non-compliance

7

with federal or state regulations" does not constitute protected conduct, because, in such a situation, there is no distinct possibility of FCA litigation.  *United States ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 740 (D.C. Cir. 1998).  Second, to be covered by the FCA, a plaintiff's investigation must concern "false or fraudulent" claims.  Id.  Taken together, these limitations ensure that only those employees "who have acted in furtherance of an action under the FCA" are protected.  *United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1269 (9th Cir. 1996).

In *Mann*, the court concluded that a distinct possibility exists if the evidence suggests that the employer had a reasonable fear that the employee was "contemplating filing a *qui tam* action . . . or reporting the employer to the government for fraud."  Id. at 1314.  Trying to apply this definition to the present case presents a number of difficulties.  First, where the conduct at issue relates to a matter which cannot possibly result in an action under the FCA, there cannot be a "distinct possibility," and, therefore, the conduct in question is not protected.  This is the scenario presented by the fire damage allegations.  Bryant does not claim that any potentially fraudulent conduct occurred.  Instead, she claims simply that, when McDonald asked whether anything could be done for the man whose house had been damaged, she stated that any payment to him would contravene HUD regulations.  Where both employer and employee know that no fraudulent act occurred, it is

8

impossible for the employee's conduct to be "in furtherance of" an action under the FCA. Therefore, her conduct in this instance was not protected by §3730(h). The fact that Bryant told McDonald that she would report him if he did take action is irrelevant.

Bryant argues that, even though no fraudulent act occurred, it is still possible that her conduct was protected. She bases this argument on the fact that:

> [E]ven a well-pleaded retaliation complaint need not allege that the defendant submitted a false claim . . . . [I]nstead, [a plaintiff] need prove only that the defendant retaliated against [her] for engaging in lawful acts done . . . 'in furtherance of' an FCA 'action filed or to be filed,' language that protects an employee's conduct even if the target of an investigation or action to be filed was innocent.

*Graham County Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 545 U.S. 409, 416, 125 S. Ct. 2444, 2449 (2005). This language provides no support for Bryant's position. Instead, the quoted language only establishes that the conduct must be "in furtherance of" a FCA action. The "distinct possibility" test is employed to determine when conduct is "in furtherance of" a FCA action. Where there is no possibility that a FCA suit would ever be filed, and the plaintiff was "merely attempting to get [the employer] to comply with Federal and State regulations," the conduct was not "in furtherance of" an action. *United States ex rel. Hopper v. Anton et al.*, 91 F.3d 1261, 1269 (9th Cir. 1996). Furthermore, a more plausible interpretation of the quoted language than the one offered by Bryant is that the Supreme Court was merely

9

recognizing that success as a *qui tam* plaintiff is not a prerequisite for success under § 3730(h). For a variety of reasons, including jurisdictional bars, lack of participation by the United States, and failure to qualify as the "first to file," a plaintiff whose *qui tam* action ultimately fails is still a protected whistle-blower if there was a "distinct possibility" that the protected conduct could lead to a FCA suit. *United States ex rel. Ramseyer v. Century Healthcare Corp.*, 90 F.3d 1514, 1522 (10th Cir. 1996) (noting that "the case law is clear that a retaliation claim can be maintained even if no FCA action is ultimately successful. . .").

The only remaining basis for Bryant's suit, then, is her investigations into the rent concessions. Again, there is no evidence that the rent concessions violated any HUD regulations, and the parties present the same arguments in support of their respective positions. However, there are important differences between Bryant's conduct with respect to the rent concessions and the fire damage. First, Bryant alleges that she conducted an actual investigation into the conduct surrounding the rent concessions. Second, and more importantly, the granting of rent concessions by the Housing Authority is a matter "which [is] calculated, or reasonably could lead, to a viable FCA action." *Neal v. Honeywell Inc.*, 33 F.3d 860, 864 (7th Cir. 1994).

If it is ultimately determined that the allegations made by

Bryant regarding the rent concessions are true, "then a § 3730(a) action was a distinct possibility at the time" she conducted her investigation. *Childree v. UAP/GA AG Chem, Inc.*, 92 F.3d 1140 (11th Cir. 1996). Therefore, summary judgment cannot be granted on the basis that this conduct by Bryant was not protected.

### ii. Notice

The legislative history of the FCA and the related case law clearly establish that an employer without knowledge or notice of its employee's protected conduct cannot be liable under § 3730(h). *Childree v. UAP/GA CHEM Inc.* 92 F.3d 1140, 1146 (11th Cir. 1996). Certainly, an employee who informs her employer that, based on her investigation, she is planning on filing a *qui tam* action has put the employer on notice of a potential FCA action. This is the easy case. However, most employees do not inform their employers point-blank that they intend to seek a remedy under the FCA, most often because the employee is unaware of the statute. In such a case, courts must find notice by inference from the particular facts of the case.

Different courts have required whistle-blower plaintiffs to establish different levels of notice to their employers. For example, the *Mann* court imposed a very low threshold when it stated that "when an employee informs her employer about the discovery of suspected fraud and the employer takes no action to correct it, the employer has reason to fear that the employee will file a *qui tam*

11

action or report suspected fraud to the government, unless the employee. . . affirmatively indicates otherwise." *Mann*, 49 F. Supp. 2d at 1315.  This is a deduction this court us unwilling to make without other facts to support such a conclusion.  Other courts have imposed a higher threshold, requiring the plaintiff to shoulder the "burden of pleading facts which would demonstrate that defendants had been put on notice that the plaintiff was either taking action in furtherance of a private *qui tam* action or assisting in an FCA action rather than **merely warning the defendants of the consequences of their conduct**." *Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 567 (6th Cir. 2003) (quoting *United States ex rel. Ramseyer v. Century Health Care Corp.*, 90 F.3d 1514, 1522 (10th Cir. 1996)) (emphasis in original).  Still others have fallen somewhere in between.  For example, the Seventh Circuit held that a plaintiff "had to show only that [the employer] was aware of his investigation. . ." *Fanslow v. Chicago Manufacturing Center, Inc.*, 384 F.3d 469, 484 (7th Cir. 2004).

The Eleventh Circuit recently held that a plaintiff must make at least some showing that his employer was on actual notice of the protected conduct.  *Mack v. Augusta-Richmond County, Georgia*, 148 Fed. Appx. 894 (11th Cir. 2005).  Without such notice, the plaintiff "cannot show that the employer. . . could have reasonably believed [plaintiff's] actions provided a 'distinct possibility' that [he] would file a [FCA] suit." Id. at 897.  It is, therefore,

the conclusion of this court that, at a minimum, where there is no express declaration that an employee, or somebody under the employee's influence, intends to file suit, the employer must have knowledge of that employee's investigative conduct that would suggest FCA activity.  This means that an employee's merely informing his supervisor or employer of allegedly improper conduct does not establish that employer's awareness of protected conduct. *Yesudian*, 153 F.3d at 743 (noting that merely "grumbling" to an employer about a regulatory violation does not satisfy the notice element).

In this case, the evidence shows that, after learning about the rent concessions, Bryant confronted Judy Bryant and McDonald and informed them that it was her belief that the concessions contravened HUD regulations.  According to Bryant's testimony, she never told McDonald or Judy Bryant that she was conducting **any type of investigation** regarding her concerns.[3]  Even drawing all reasonable inferences in her favor, there is no evidence to suggest that the Housing Authority or McDonald had any notice of Bryant's protected conduct.  Therefore, she has failed to establish a viable claim for retaliation under § 3730(h).

---

[3] Bryant does state in her brief that "[t]he evidence also shows that both Lewis McDonald and Judy Bryant were aware that the plaintiff made a complaint that the rent concessions were illegal."  She does not specify to whom this complaint was directed.  Nor does she point to any evidence indicating that such a complaint was ever made to anyone other than McDonald or Judy Bryant.

13

*b) First Amendment*

Bryant asserts that her federal constitutional right of free speech was violated when she was terminated for voicing her opposition to the Housing Authority's policies described above. Her claims are brought under 42 U.S.C. § 1983, which creates a remedy for the depravation of a federally protected right. A § 1983 claim of retaliation based on the First Amendment is analyzed using a four-part test. *Johnson v. Clifton*, 74 F.3d 1087, 1092 (11th Cir. 1996). Under this test, a plaintiff must show that (1) the exercise of free speech pertained to a matter of public concern; (2) the employee's First Amendment rights outweighed those of the employer in preserving the efficiency of government services, and (3) the employee's conduct was a substantial motivating factor in the adverse employment action. Should the employee manage to establish these first three elements, the fourth stage of the test shifts the burden to the employer to establish that the same employment action would have been reached even in the absence of the protected speech. *Mt. Healthy School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 97 S. Ct. 568 (1977).

The Housing Authority and the Individual Defendants present two bases for summary judgment on the First Amendment claim. First, they argue that because Bryant's speech occurred in the context of her employment duties, the protections of the First Amendment are inapplicable. Second, they argue that Bryant's

14

interest in speaking on these matters was outweighed by the Housing Authority's legitimate interest in efficient public service. Therefore, they argue, her termination did not violate her constitutional rights. This court agrees with defendants that First Amendment protections did not inure to Bryant's benefit.

The first part of the four-part test requires that protected speech relate to matters of "public concern." Determining whether speech is related to a matter of public concern is a question of law, and the burden rests with the plaintiff. *Nero v. Hospital Authority of Wilkes Cty.*, 86 F. Supp. 2d 1214, 1224 (S.D. Ga. 1998). There is no precise method for categorizing particular speech. Instead, the trial court must focus on factors such as "the content, form, and context of the given statement, as revealed by the whole record." *Ferrara v. Mills*, 781 F.2d 1508, 1514 (11th Cir. 1986).

Bryant argues that because her statements involved the Housing Authority's compliance with HUD regulations, the speech was necessarily a matter of "public concern". This argument is incorrect and reflects a misunderstanding of the definition of "public concern" in the context of § 1983 litigation. Bryant's mistake is in assuming that any speech related to the affairs or conduct of a governmental agency is necessarily a matter of "public concern." Simply because information may be of "general interest to the public . . . does not alone make it of 'public concern' for

First Amendment purposes." *Morris v. Crow*, 142 F.3d 1379, 1381 (11th Cir. 1998). Were this the legal standard, it "would mean that virtually every remark – and certainly every criticism directed at a public official – would plant the seed of a constitutional case." *Connick v. Myers*, 461 U.S. 138, 149, 103 S. Ct. 1684, 1698 (1983). Instead, a distinction must be drawn between speech made as an employee and speech made as a citizen. When an employee makes a statement "pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti v. Ceballos*, 126 S. Ct. 1951, 1960 (2006). This rule applies even where, as in this case, the content of the speech concerns important matters of public policy.

The only conclusion supported by the undisputed facts is that, when speaking to her supervisors, Bryant spoke in her capacity as an employee. Perhaps recognizing this, Bryant argues that her statements were made on matters which fell outside of her job responsibilities. For example, she argues that providing rent concessions was not a duty of an occupancy specialist. Therefore, the argument runs, speaking out against the concessions was the act of a citizen and not an employee. This argument is predicated on an unreasonably narrow interpretation of what it means to be employed. Bryant learned of both the rent concessions and fire

16

damage during the normal course of her employment.  Her basis for concluding that the conduct was impermissible was the training and knowledge she received as an employee.  Most telling, when she learned of the conduct, the only people she informed were McDonald and Judy Bryant, her immediate supervisors.  Given the context of these events, it is the conclusion of this court that her speech was inextricably linked to her employment with the Housing Authority.  As such, it is unprotected by the First Amendment.

    c) Additional Defenses

Defendants argue that, even assuming she could establish a *prima facie* case under the FCA, Bryant's claims are nevertheless barred.  They offer two plausible justifications for this position.  First, they argue that Bryant cannot prove a causal connection between her statements to the Housing Authority and her termination.  Second, they point to "numerous legitimate, non-retaliatory reasons" for Bryant's termination.  The court need not address these proffered defenses because it has already determined that summary judgment is due to be granted.

    d) The Other Claims

In addition to her claims under the FCA and § 1983, Bryant raised five other claims in her complaint.  As stated in her brief on summary judgment, Bryant seeks to voluntarily dismiss, with prejudice, the remaining claims.  The court will do so by separate order.

17

## III. Conclusion

The court concludes that Bryant cannot establish cognizable claims under the FCA or § 1983.  Therefore, defendants' motion for summary judgment will be granted by a separate order.

DONE this 8th day of November, 2006.

```
                              _____
                              WILLIAM M. ACKER, JR.
                              UNITED STATES DISTRICT JUDGE
```